In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 04-4221 & 05-2316

EFRAIN SANTOS and BENEDICTO DIAZ,

*Petitioners-Appellees*,

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellant.*

———————

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
Nos. 01 C 638 & 01 C 501—**James T. Moody**, *Judge.*

———————

ARGUED MAY 12, 2006—DECIDED AUGUST 25, 2006

———————

Before MANION, KANNE, and ROVNER, *Circuit Judges.*

MANION, *Circuit Judge.* Efrain Santos and Benedicto Diaz ran an illicit lottery, which landed them in federal prison on money laundering charges. Their money laundering convictions were premised upon the word "proceeds" in 18 U.S.C. § 1956(a)(1) meaning gross income of unlawful activity. This court affirmed the judgments against them in *United States v. Febus*, 218 F.3d 784 (7th Cir. 2000). However, in later proceedings under 28 U.S.C. § 2255, the district court vacated their money laundering convictions on the basis of our decision in *United States v. Scialabba*, 282 F.3d 475 (7th Cir. 2002), which defined "proceeds" to mean net income, as

opposed to gross income.[1] The government appeals, asking us to overturn *Scialabba* and interpret the pivotal term "proceeds" to mean gross income. In the interest of stability in the law, we decline to do so and thus affirm the district court's judgments in favor of Santos and Diaz.

## I.

The underlying facts of this case are not in dispute. Efrain Santos operated an illegal lottery, known as a "bolita," in Northwest Indiana from the 1970s until the 1990s. It worked by gamblers placing their bets with the bolita's runners, primarily at local restaurants and taverns. The runners then turned the wagers over to the bolita's collectors, who, in turn, gave the money to Santos. One collector in Santos's employ was Benedicto Diaz. Santos paid, either directly or indirectly, the runners, the collectors, and, of course, the bolita's winners out of the total amount collected. Additional background on Santos, Diaz, and the bolita is detailed in our prior opinion on this matter, *see Febus*, 218 F.3d at 788-91.

A grand jury indicted Santos, Diaz, and eleven others in a ten-count indictment. It named Santos in all ten counts, and Diaz in counts one through four. Count 1 alleged a

---

[1] The parties' briefs use the terms gross income, gross receipts, and gross revenue interchangeably to refer to the aggregate amount received into a business operation. In the interest of clarity, this opinion will use "gross income" in this context. Similarly, the parties employ the terms net income, net profits, net gains, net receipts, net revenues, and profits to describe the amount remaining after a business operation's expenses are subtracted from its gross income. This opinion will use "net income" to describe the same.

conspiracy to conduct an illegal gambling business, 18 U.S.C. § 371. Count 2 charged the defendants with conducting an illegal gambling business, 18 U.S.C. § 1955. Count 3 alleged a conspiracy to use the proceeds of an illegal gambling business to promote the carrying on of the business, i.e., a conspiracy to launder money, 18 U.S.C. §§ 1956(a)(1)(A)(i) & (h). Count 4 charged the defendants with money laundering by completing a financial transaction with the proceeds of the illegal gambling business with the intent to promote the carrying on of the business, 18 U.S.C. § 1956(a)(1)(A)(i). Counts 5 to 10 were similar money laundering charges under § 1956(a)(1)(A)(i).

A jury convicted Santos on the first five counts and acquitted him of the remainder. The district court sentenced him to 60 months of imprisonment on illegal gambling counts (1-2) and 210 months on the money laundering counts (3-5), all to run concurrently. For his part, Diaz pleaded guilty to count 3, conspiracy to launder money, and the other counts against him were dismissed. The district court sentenced him to 108 months of imprisonment. Thereafter, this court rejected Santos's and Diaz's direct appeals. *See Febus*, 218 F.3d at 789-91.

The two then initiated collateral proceedings with respective motions under 28 U.S.C. § 2255, each raising a number of issues. The district court rejected all but one issue in each case. The district court granted Santos and Diaz relief under § 2255 because—based upon our decision in *Scialabba,* which held that § 1956(a)(1)'s term "proceeds" meant net income, *see* 282 F.3d at 476-78—the district court held that Santos and Diaz were actually innocent of the crime of promotional money laundering and/or conspiracy to commit the same.

When the district court reached that conclusion, and thus vacated Santos's money laundering convictions (counts

3-5), Santos had already completed his concurrent 60-month sentences for his illegal gambling convictions (counts 1-2). Therefore, since the district court invalidated the only convictions keeping Santos in prison, the district court ordered his release upon his posting of a $20,000 unsecured bond. As for Diaz, the district court's § 2255 decision vacated his only count of conviction (count 3), and the district court likewise ordered his release with a $20,000 unsecured bond. The government appeals the grant of the two § 2255 motions.

## II.

In challenging the district court's respective decisions to vacate Santos's and Diaz's money laundering convictions, the government raises one argument. It contends that the word "proceeds" in § 1956(a)(1) should be interpreted to mean gross income, not net income. The government's appeal here is thus nothing less than a frontal assault on *Scialabba.* In seeking to revive the vacated convictions, the government does not attempt to outflank or distinguish *Scialabba* in any way. Rather, it frankly concedes that, if the interpretation in *Scialabba* stands, there is insufficient evidence to support Santos's and Diaz's money laundering convictions and, as a result, the district court correctly vacated them. We first review the pertinent statutory section, as well as the holdings in *Febus*, and *Scialabba,* and how they impact the appeal before us.

Section 1956(a)(1)(A)(i) provides as follows:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact

> involves the proceeds of specified unlawful activity—(A)(i) with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

The unlawful activity here was an illegal gambling business, specifically, the bolita. Thus, to convict Santos of money laundering, the government had to prove that he knowingly conducted or attempted to conduct a financial transaction; that the property involved in the financial transaction in fact involved the proceeds of his bolita; that he knew that the property involved in the financial transaction represented illegal proceeds; and that he engaged in the financial transaction with the intent to promote the carrying on of the bolita. *See United States v. Emerson*, 128 F.3d 557, 561 (7th Cir. 1997); Seventh Circuit Pattern Criminal Jury Instructions 18 U.S.C. § 1956(a)(1)(A)(i) (1999). Such elements were also necessary to support Santos's and Diaz's related conspiracy convictions under § 1956(h). *See United States v. Turner*, 400 F.3d 491, 496 (7th Cir. 2005).

The financial transactions at issue in Santos's case were payments to the bolita's collectors and winners. With respect to Diaz, his conspiracy conviction was based upon the receipt of payment for his collection services. When the case arrived here on direct appeal, Santos acknowledged

that he used the bolita's proceeds to pay its collectors' salaries and its winners' winnings. *See Febus*, 218 F.3d at 789. The focus in *Febus* was on § 1956(a)(1)(A)(i)'s promotion element: Santos argued that paying salaries and winnings did not promote the carrying on of the bolita. *See id.* at 789-90. As to the important issue in the present appeal, there was no dispute in *Febus* about the meaning of the word proceeds. In contrast to the current situation, Santos—by acknowledging that the salaries and winnings (i.e., operating expenses) came out of its "proceeds"—assumed that the term meant gross income, and *Febus* proceeded accordingly.

In addressing whether the government's case had met the promotion element, *Febus* determined that promotion under § 1956(a)(1)(A)(i) included "transactions that promote the continued prosperity of the underlying offense." *Id.* at 790 (citing *United States v. Conley*, 37 F.3d 970, 979 n.12 (3d Cir. 1994)); *see also* 218 F.3d at 789 (discussing *United States v. Jackson*, 935 F.2d 832, 841-42 (7th Cir. 1991)). Consequently, *Febus* concluded that Santos's payments of proceeds to the collectors, including Diaz, fell into this category because those transactions "compensated them for collecting the [bolita's] increased revenues and transferring those funds back to [Santos]." 218 F.3d at 790. *Febus* further reasoned that winning payouts from the bolita's proceeds sufficiently promoted the carrying on of the unlawful activity in that the transactions "promoted the bolita's continuing prosperity by maintaining and increasing the players' patronage." *Id.* (citing *United States v. Cole*, 988 F.2d 681, 684 (7th Cir. 1993)).

The gross-versus-net-income dispute then arose in *Scialabba*, which, while not mentioning *Febus* by name, distinguished *Febus* and its default treatment of the term proceeds as gross income by stating "[n]either the Supreme Court nor this circuit has defined the word 'proceeds' [in

§ 1956(a)(1)], and there is no definition in the statute itself." *Scialabba*, 282 F.3d at 475. The underlying offense in *Scialabba* was also illegal gambling. *See id.* at 475-76. The defendants operated video poker machines in taverns and other establishments. Among other crimes, the defendants were convicted of money laundering under § 1956(a)(1)(A)(i). Strikingly similar to the situation in *Febus*, the financial transactions at issue were the defendants' compensation-related payments to tavern owners who helped facilitate their gambling operation, including its collections, as well as the payouts to winning bettors. *See id.* at 476.

*Scialabba*, however, ruled that such transactions, which constituted the payment of the enterprise's operating expenses out of its gross income, could not support the defendants' money laundering convictions. *See id.* at 476-78. In reaching that result, *Scialabba* indicated that the term proceeds in § 1956(a)(1) was ambiguous, in that it was unclear if the term meant gross or net income. *See id.* at 477. *Scialabba* then, relying on the rule of lenity[2] and seeking to avoid "convict[ing] a person of multiple offenses when the transactions that violate one statute necessarily violate another," interpreted the term to mean net income. *Id.* ("By reading § 1956(a)(1) to cover only transactions involving [net income], we curtail the overlap [between the crime of money laundering and the underlying criminal activity] and ensure that the statutes may be applied independently to sequential steps in a criminal enterprise.").

---

[2] When "there is a grievous ambiguity or uncertainty in the language and structure" of a statute, "the rule of lenity instructs that ambiguity in the meaning of a statutory provision should be resolved in favor of the defendant." *United States v. Turcotte*, 405 F.3d 515, 535 (7th Cir. 2005) (quotations omitted).

Specifically, *Scialabba* held "that the word 'proceeds' in § 1956(a)(1) denotes net rather than gross income of an unlawful venture," *id.* at 478, "otherwise the predicate crime merges into money laundering (for no business can be carried on without expenses) and the word 'proceeds' loses operational significance." *Id.* at 475; *see also id.* at 477-78 (distinguishing *United States v. Mankarious*, 151 F.3d 694, 706 (7th Cir. 1998); *Jackson*, 935 F.2d at 839-42; *Conley*, 37 F.3d 970). As a result, *Scialabba* vacated the defendants' money laundering convictions. *See* 282 F.3d at 478.[3]

The transactions in the present case—compensating the bolita's collectors and paying its winners—are conceptually indistinguishable from the transactions in *Scialabba* which were held to be insufficient under § 1956(a)(1)(A)(i). Such payments of the bolita's operating expenses came out of its gross income. Moreover, the government concedes that there is insufficient evidence in the record to show that the property involved in these transactions involved the bolita's net income, i.e., "proceeds" under *Scialabba*. Since the conduct that led to Santos's and Diaz's convictions only amounted to the disposition of the bolita's gross income, the district court reasoned that the two were convicted of "acts that are not now, nor ever have been, crimes" in this circuit and that the two are entitled to the benefit of *Scialabba* in their § 2255 proceedings. R.46 (Santos) at 27-31; R.38 (Diaz)

---

[3] Upon the government's petition, a vote of the court's then-active members was requested to rehear *Scialabba* en banc, and the petition for rehearing en banc was denied by an equally divided court (5-5). *See United States v. Scialabba*, Nos. 01-1291 & 01-1292, 2002 U.S. App. LEXIS 10014, at *1 (7th Cir. May 22, 2002). The government's petition for a writ of certiorari was also denied. *See United States v. Scialabba*, 537 U.S. 1071 (2002).

at 22-25; *see also Lanier v. United States*, 220 F.3d 833, 838 (7th Cir. 2000) (discussing *Teague v. Lane*, 489 U.S. 288, 305-09 (1989); citing *Bousley v. United States*, 523 U.S. 614, 620 (1998)). The government here presents no argument to the contrary, and we need not pursue these issues further in this opinion.

Rather, as indicated above, the only issue the government presents for our review is whether *Scialabba* should be overturned, which would thereby mandate the reversal of the district court's judgments in favor of Santos and Diaz. "We require a compelling reason to overturn circuit precedent." *McClain v. Retail Food Employers Joint Pension Plan*, 413 F.3d 582, 586 (7th Cir. 2005); *see also United States v. Shutic*, 274 F.3d 1123, 1126 (7th Cir. 2001). What is more, "principles of stare decisis require that we 'give considerable weight to prior decisions of this court unless and until they have been overruled or undermined by the decisions of a higher court, or other supervening developments, such as a statutory overruling.'" *Haas v. Abrahamson*, 910 F.2d 384, 393 (7th Cir. 1990) (quoting *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987)); *see also McClain*, 413 F.3d at 586; *Bethesda Lutheran Homes & Servs., Inc. v. Born*, 238 F.3d 853, 858-59 (7th Cir. 2001); *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1364 (7th Cir. 1996). Here, there has been no such decision by a higher court or a statutory overruling. *Scialabba* is thus entitled to "considerable weight."

The government raises several important points in favor of its position. To start, all the other circuits that have confronted the statutory debate over whether "proceeds" in § 1956(a)(1) means gross or net income have rejected *Scialabba's* approach. *See Russ v. Watts*, 414 F.3d 783, 788 (7th Cir. 2005) (discussing when other circuit opinions might present a compelling reason to overrule circuit precedent).

Most prominent is the Third Circuit, which believes that *Scialabba* "reaches an incorrect result" and held that § 1956(a)(1)'s term proceeds "means simply gross receipts from illegal activity." *United States v. Grasso*, 381 F.3d 160, 167, 169 (3d Cir. 2004), *vacated on other grounds*, 544 U.S. 945-46 (2005). *Grasso* upheld money laundering convictions that were based upon a fraud scheme's advertising, printing, and mailing expenses. 381 F.3d at 162, 169. *Grasso* analyzed several dictionary and legal definitions for the word proceeds and correctly determined that the definitions showed that the word could mean either gross or net income. *Id.* at 167-68. For instance, *Grasso* noted that one dictionary defined proceeds as the "total amount brought in" but also as "net profit" and "the net sum received after deduction of any discount or charges." *Id.* at 167 (citing *Webster's Third New International Dictionary* 1807 (1986)). *Grasso* thus stated: "Given the many definitions of 'proceeds' and the uncertain value of congressional records in choosing among them, the best approach, we believe, is to examine the statute itself for indications of the intended scope of the term." *Id.* at 168. Then, without discussing the rule of lenity and *Scialabba's* reliance upon it, *Grasso* summarily concluded that, because the statute prohibits the promotion of illegal activity, the use of an unlawful operation's gross income to sustain itself is "clear[ly]" punishable under the statute. *Id.* at 168-69 & n.13; *but see Scialabba*, 282 F.3d at 477 ("[T]he context [of the statute] does not reveal whether the reference is to gross receipts or net income.").

The only two other circuits to address the gross-versus-net-income issue identified in *Scialabba* are the First and

Eighth.[4] The First Circuit, in one brief paragraph in a forfeiture dispute, acknowledged *Scialabba*, but declined to read the § 1956(a)(1)'s term proceeds as net income based upon its prior interpretation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq. See United States v. Iacaboni*, 363 F.3d 1, 4 (1st Cir. 2004) (citing *United States v. Hurley*, 63 F.3d 1, 21 (1st Cir. 1995)); *but see United States v. Genova*, 333 F.3d 750, 761 (7th Cir. 2003) (RICO forfeiture case defining proceeds as net income) (citing *United States v. Masters*, 924 F.2d 1362, 1369-70 (7th Cir. 1991); comparing *Scialabba*, 282 F.3d 475). Thus, *Iacaboni*, an illegal sports gambling case, ruled that payouts to winning bettors were financial transactions involving proceeds for § 1956(a)(1) purposes. 363 F.3d at 4. For its part, the Eighth Circuit, in another forfeiture situation, followed *Grasso* without discussion. *See United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005). Thus, while there is certainly opposition to *Scialabba*, it is not as entrenched as the government paints it to be.

The government also maintains that *Scialabba* incorrectly limited the crime of money laundering to situations in which criminals conceal their proceeds, thereby eviscerating

---

[4] Several other circuit opinions available at the time *Scialabba* was decided treat the word proceeds in § 1956(a)(1) as gross income, but these earlier opinions did not enter (because they were not asked to) the gross-versus-net-income debate initiated by *Scialabba*. *See, e.g.*, *United States v. Monaco*, 194 F.3d 381, 385-86 (2d Cir. 1999); *United States v. Akintobi*, 159 F.3d 401, 403-05 (9th Cir. 1998); *United States v. Haun*, 90 F.3d 1096, 1101 (6th Cir. 1996). *See also United States v. Silvestri*, 409 F.3d 1311, 1332-33 (11th Cir. 2005) (18 U.S.C. § 1957 context; handling the term proceeds in a manner akin to that of *Akintobi* and *Haun*; no discussion of gross versus net income).

§ 1956(a)(1)'s promotional subsection. *Grasso* mentioned this point as well. 381 F.3d at 168. This is a misreading of *Scialabba*. 282 F.3d at 476. To be sure, the statute criminalizes the concealment of proceeds and also prohibits the use of proceeds to promote the illicit activity. *Compare* 18 U.S.C. § 1956(a)(1)(B) *with* 18 U.S.C. § 1956(a)(1)(A)(i). *Scialabba*, however, did not override the latter. There is a distinct difference between paying expenses and reinvesting net income. While, under *Scialabba,* the act of paying a criminal operation's expenses out of its gross income is not punishable under § 1956(a)(1)(A)(i)—but rather is punishable as part of the underlying crime—the act of reinvesting a criminal operation's net income to promote the carrying on of the operation is still punishable under § 1956(a)(1)(A)(i). Furthermore, in mentioning concealment, *Scialabba* merely pointed out that concealment was not at issue and that the government's case rested solely on the disposition of gross income and whether such disposition was actionable under § 1956(a)(1)(A)(i). 282 F.3d at 476. *Scialabba* touched upon the lack of concealment simply to show that, to resolve the case, the court had no alternative but to interpret the word proceeds.

Additionally, the government contends that serious evidentiary problems result from interpreting proceeds to mean net income. Sure enough, criminals do not always keep ready records of their dealings, and, when they do, the line between the payment of expenses and reinvestment of net income is, generally speaking, murky, especially given the likely absence of accounting standards. *See Grasso*, 381 F.3d at 169 n.13. Sorting out an illicit business's net income, therefore, can complicate the government's task of proving promotional money laundering, not to mention courts' and juries' respective roles in defining and determining what is and is not net income. This is a solid policy point (which the

government may wish to present to Congress), but it is not enough to overcome the considerable weight afforded to *Scialabba*.

That policy point does tie into a related concern raised at oral argument about the sentencing disparity between money laundering and, in this case, running an illegal gambling business. The elimination of Santos's money laundering convictions, for instance, ended his 210-month sentence, leaving him with only a 60-month sentence, which he had already served. *Cf. Scialabba*, 282 F.3d at 476 (similar differences). More generally, when, as in Santos's case, the government proves a defendant has engaged in an illegal gambling business but is unable to establish the business's net income for purposes of the money laundering statute, the statutory maximum facing the defendant goes from 240 months to 60 months. *Compare* 18 U.S.C. § 1956(a)(1) *with* 18 U.S.C. § 1955(a). Moreover, in terms of money laundering, the Sentencing Guidelines ratchet up a defendant's base offense level in relation to the value of the laundered funds; however, there is no similar value/amount provision for engaging in an illegal gambling business. *Compare* U.S.S.G. § 2S1.1(a)(2) (2005) (cross-referencing U.S.S.G. § 2B1.1) *with* U.S.S.G. § 2E3.1 (2005). This concern, of course, is not grounds to overturn circuit precedent; we mention it here simply to note the sentencing consequences that can result when, due of a lack of net income evidence, § 1956(a)(1)(A)(i) is unavailable to the government in combating large-scale illegal gambling operations.

Having considered the government's arguments, the most we can say here is that the government has demonstrated that the question of whether Congress intended the term proceeds in § 1956(a)(1)(A)(i) to mean gross or net income is a debatable one. However, simply showing that a point is

debatable is not enough to meet the compelling-reasons standard for overturning circuit precedent. *See Russ*, 414 F.3d at 788; *McClain*, 413 F.3d at 586-87; *Bethesda Lutheran*, 238 F.3d at 858-59. Overturning circuit precedent—upsetting the stability and predictability of the law—is not something that should be taken lightly (even when the previous decision was upheld by a 5-5 vote, *see supra* note 3). Rather than vacillate over Congress's intent, it is better for our circuit here, having already considered and duly decided the issue, to stay the course at this juncture, for only Congress[5] or the Supreme Court can definitively resolve the debate over this ambiguous term. *See Midlock v. Apple Vacations West, Inc.*, 406 F.3d 453, 457 (7th Cir. 2005); *Bethesda Lutheran*, 238 F.3d at 858-59; *Joy v. Penn-Harris-Madison Sch. Corp.*, 212 F.3d 1052, 1065 (7th Cir. 2000) ("Stare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." (quotation omitted)); *Mid-Am. Tablewares*, 100 F.3d at 1364 ("Stare decisis is of fundamental importance to the rule of law." (quotation omitted)); *see also Trompler, Inc. v. NLRB*, 338 F.3d 747, 753 (7th Cir. 2003) (Easterbrook, J., concurring) ("Restless

---

[5] We briefly note that, in the closely related context of illegal gambling businesses, Congress has already quelled any debate over the type of funds that triggered criminal liability. One path to proving a § 1955 violation is to show that the illegal gambling business had "*gross* revenue of $2,000 in a single day." 18 U.S.C. § 1955(b)(1)(iii) (emphasis added). By similarly incorporating the word gross or net into § 1956 to define proceeds, Congress could quickly resolve the meaning of this problematic term.

movement from one side of this conflict to another will not make it go away; sooner or later, either Congress or the Supreme Court must bring harmony. Until that happens, judicial resources will be conserved, and predictability increased, if each circuit that has reached a decision sticks with it.").

## III.

The government has not presented a compelling reason to overturn *Scialabba* and its holding that the term "proceeds" in § 1956(a)(1) means net income. Accordingly, the district court's respective judgments in favor of Santos and Diaz are AFFIRMED.

A true Copy:

     Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
